As the oralists could probably discern, George Nardini is not available today, but he is a member of the panel. He will be participating. And for you and for your clients, that will likely mean that we will keep you up longer than your time just to make sure that we are covering the waterfront so that he has a good To be able to listen to and lean from when he's not here to be able to ask his own questions. Mr. Callender, you have reserved two minutes. Is that right? Yes, Your Honor. But again, we're not going to pay a whole lot of attention to the clock. When you are ready, you may proceed. May it please the court. Jeffrey Callender of Slater-Schlatter-Schulman for the plaintiff appellant, Filomeno-Russo. Ms. Russo filed a federal complaint, and that complaint was alleging that she had been, suffered sexual discrimination, gender discrimination, and retaliation under Title VII under the New York State Human Rights Law. Within two days of that complaint being served, she was suddenly accused of having two years previously drugged and sexually molested two of her students on a trip to Puerto Rico. After that happened, Ms. Russo was immediately suspended and investigated. There was no finding on there. She amended her complaint to include this matter for retaliation under both Title VII and the New York State Human Rights Law. So if I could just make very clear for the record on appeal, what do you allege was the retaliatory act? The retaliatory act was putting her under this investigation as well as the assignment to the- So the investigation and then the reassignment. And then the rumors, pardon me. The rumors were retaliation to? The rumors that started being spread amongst the administration, yes. Okay. And the protected activity was? She had filed a federal complaint. So it's the filing activity and the- So can you explain to me what role that Singleton plays in the retaliation? Because my understanding is that you are not arguing cat's paw for Singleton, purely for siblings. So if he was the one that spurred the investigation that caused Hodges, how are we able to attribute that to Sibley? It comes back to Sibley's a couple different ways, one of which is through one of the affidavits. And further, I think it's also biological inference. Affidavit? Affidavit of the Leggett Affidavit, where- I'm sorry, no, it's the Sexton Affidavit, where she says that she received a call from Sibley's saying that- or received a call from Singleton saying, we need your help, your son's help. Me and Mr. Sibley's go further in the affidavit. She also overhears at a- Sexton's the one who lost her son. Excuse me? Sexton's the woman. Yeah, Sexton- one second, let me make- I'm sorry, no. Yes, Sexton is the one who lost her son, sorry. Sexton ended up- or the son's ship ended up making statements to both of the affidavits. Okay, so I do think we do need to talk about the affidavits. But I want to just make sure that I understand the theory of liability. You are arguing Katz fought for Sibley, how? Where are you showing that Sibley had anything to do with what Hodges and Hodges higher-ups did? Well, there is, like I said in the affidavit, there is the statement, we are going to bury that bitch. Further, there is the fact that this is- Okay, but why is that- why did you not- so you're saying that we need to do a couple of things. I just want to make sure I understand the argument. That we need to infer that Singleton was being cat-pawed by Sibley, and then that got Hodges, and then Sibley was the indirect cat-paw for Hodges. I am missing the link between what Singleton did, which was, as far as I can tell from the records, spur the investigation, and your theory of why the person you sued for alleged cat-paw was Sibley. Well, and then the other matter that comes up is in the affidavit of Catherine Popka, which was considered by the court and not ruled an issue of hearsay. And in that, Ms. Popka was- Yeah, but Popka does not say that Sibley prompted Singleton to prompt Hodges. No, but what she does say is that if- That it would go away if she dropped her- If she dropped her case. And I think that is important that she states what has to do with whether or not I dropped the case. What is the connection between what Popka did and what Hodges did? Otherwise, it's just Popka's guess, right? Popka's assessment? Popka's belief? Where is the connection between what Popka said and the action that Hodges took? Well, it's an explanation of what is going on there in the background is what Popka provides. And with respect to the actions that Hodges took, I think we have a number of questions about why Hodges took the actions that he did. First of all, the district court does misstate that Hodges was saying that Hodges was unaware of the complaint against Sibley's at the time when he elevated the matter to the district superintendent, which is not correct. If you'll look at the Hodges affidavit, he does say- Yeah, I'm not sure that it matters. So let's- Well, you can tell me why that matters. I'm inclined to think that that doesn't go either way. So maybe why don't you tell me that wrong. Why is whether or not Hodges knew or didn't know about the complaint relevant to what needed to happen in response to the allegation that was made about what your client was doing with underage children? Well, I think it matters in that the investigation is spurred by this complaint that suddenly comes out of nowhere from two years ago. And there is no skepticism with the report. There is no mention to the superintendent. Hey, by the way, this is just this same person who is now being accused had also just accused our single principal of having been- that he felt duty bound to report it, notwithstanding the fact that the timing was unfortunate, suspicious. Pick your word. He does mention that he did in his report about the complaints about that she had just complained about Singleton's behavior. She had complained that Singleton had come by the school on June 1st or actually I think it's June 2nd and allegedly sexually harassed three different teachers that day. She complained afterwards to her principal, Darlene White, who then sent in the complaint to Hodge, I believe, on June 10th. On June 14th is when she was questioned about that. OK, so let me ask. Your client sought compensatory damages, but they were- she was paid the full time and she was reinstated. So what would the compensatory damages be for? The compensatory damages, reputational. The compensatory damages for her as well. I must say, maybe I must not say, but we're concerned here about her reputation. And yet you come and pull this thing through a federal court where, you know, it's going to be repeated and repeated and repeated and repeated so long as we still have the case in the writing about it. You don't have to tell me, but I don't understand the reasons for it, the strategy of making a federal case. Well, the federal case was already there before these defamatory comments came, but then also it's the opportunity to clear her name. I don't think that that can be- Well, that's the other point I want to get to. She was ultimately found- or it was ultimately found as a result of the investigation that it was unfounded. It was unfounded. And she was reinstated. Yes. So she has been vindicated in that respect.  Look, I am not suggesting that those kinds of rumors would not be traumatic. What I'm asking for is she was eventually, in that narrow context of her employment situation, vindicated because they found nothing. And she got reinstated within a period of five days. Is that correct? Well, she was reinstated and it was a non-finding, but I don't know that that's necessarily the same as vindication or an exoneration. You've dropped your- or you've not pursued your defamation claim. Is that correct? No, we have not pursued the defamation claim. Okay, so I'm not sure how whatever we decide here is actually going to vindicate whether or not people were lying about her, right? So let's put that to the side. Can you tell me why you didn't seek recourse from Singleton? Why we didn't seek recourse- I mean, he was the one that allegedly provided the uncorroborated rumor to Hodges. Is that correct? Yeah, it is. He is the one that originally provided that. Okay, so why did you not allege Catspaw for him? Why are you not seeking recourse from him? It seemed that we had a better argument against Sibley's because it ties in with what was going on in the background. And throughout the decision by the lower court and opponents' brief, much is made of the fact that this complaint was only served two days beforehand that this all occurred. However, these allegations were made for the first time I think in February of 2020 to the EEOC. So this information had been out for some time. Okay, so in my mind, the meat of the case has to do with what does- do anti-retaliation provisions yield in the face of a duty like one that you, I think, wouldn't dispute? That when there is an allegation that- well, let me put it this way. What do you think Hodges was supposed to do when Singleton said, hey, we- I have students saying that she behaved inappropriately on this Puerto Rico trip? What was Hodges supposed to do with that? I agree that the obligation is to investigate. However, I do not know exactly what is the district policy. We haven't heard any testimony on that. My understanding is, yes, there are mandated reporters, but I'm not certain- this is a complaint that occurred two years beforehand. I think that Hodges required to look at that complaint with some degree of skepticism. And didn't the fact that she got reinstated and she was put on administrative leave and she was paid, isn't that some evidence of skepticism? It seems to me your- as I understood what you said earlier, was that the retaliation was the investigation. But I think I just heard you say they had to do something. They had to investigate. So how do we square the mandated reporter, the duty to keep children safe, with your theory that merely investigating an allegation like this was retaliation? How could it have not been retaliation unless the district decided to shirk its responsibility of investigating? Well, I say that they do have to- that some investigation is what's called for, but that's not necessarily the investigation that happened here. I don't know that it was required that she be suspended or sent to an alternate location. We haven't heard any testimony as to what exactly the district does require in these circumstances. And I would say I think it is their requirement to report this. However, I don't- we haven't heard about that. And this is some two years prior. How are you imagining us writing an opinion that is going to bind future cases in a way that accounts for a theory of retaliation that is the outcome of a- that is in conflict with a duty? Like, how do we word this such that we don't put districts in a place where they either feel like they're shirking a duty to keep the kids safe or they risk getting a retaliation claim? Well, I think that first and foremost that we would need to know exactly what the requirement is in terms of investigation and what precisely the duty is to be able to assess that. So you're the plaintiff, and you didn't say this was what their duty was, and they exceeded it by doing A, B, and C instead. Therefore, they cannot cover themselves from retaliation by claiming duty. Would you agree to that? Potentially. It's- let me make certain I understand that you're saying that in that circumstance, the claim should have been that they exceeded the bounds. And it's possible that that might have been something that we would seek to amend, having had testimony on the matter and perhaps after discovery. However, we had not gotten there when- at that point when we were put into summary judgment. Okay, so I'm going to- I'm going to- can we move on to the affidavits? Are you okay? Okay, so I want to talk about the affidavits. Say we include the statement of Shipp, right? The statement makes no mention of Sibley's or suggests any wrongdoing on the part of Sibley's or the district. So how does that help you? Well, which statement of Shipp? The accusations were false and nothing happened or that Russo never did anything wrong? Well, either. Or that Russo never did anything wrong. So Russo never did anything wrong. How does that- how does that implicate Sibley? That statement doesn't necessarily implicate- or does not necessarily implicate Sibley's, I would agree. However, the statement of Jordan does, that he was being- he was asked to provide help for Singleton and Sibley's. Okay, so you- so did I just hear you concede that Sexton was harmless error? It should have been included because there is nothing about it that would have suggested any wrongdoing on the part of Sibley's or the district? Well, I said it doesn't necessarily show any wrongdoing on the part of Sibley's. I don't know that I would concede that it necessarily shows that there was a lack of wrongdoing on the part of- What does- what do you believe that Sexton's affidavit says about wrongdoing on the district? And if you could point out where- what part of the affidavit do you think does that? I would say, well, as an initial matter, of course, just the statements that this was false and that nothing happened. And then the fact that she said that- That is a- remember, your client was vindicated- or not vindicated. Eventually, they found that your client did nothing wrong. So this statement would suggest consistency with what the investigation resulted in. The investigation said, we found nothing wrong. This Sexton's affidavit supports that. Where is the part of Sexton's affidavit that suggests that the district or Sibley did something wrong? Well, it was the fact that he had prior- that he had previously made the allegations and that this shows that he was inconsistent. And further, he says that he was paid $100 by Singleton to be questioned by the district. Wait, I'm sorry. What? That there was- he was paid $100 by Singleton to be questioned by the district is in the Sexton affidavit. Show me where. Number 10 at JA858. Coach Singleton paid my son $100 to be questioned by the district. And so from there is where- where does that connect Sibley? Again, I think you might have- you might have had a case against Singleton. Where does that connect Sibley to this? I'm not saying that that connects Sibley's. What I'm saying is that connects the district, that there were machinations going on in the background. It's evidence that something was being put together. Can we move on to Luggin? The Luggin. Mm-hmm. Where- Okay. Can you- You know what, I think I've got enough. I think we'll get you- we'll hear from you on the phone. Okay. If I- may I- Sure. I would like to talk about the 2019 amendments, the New York State human rights law, and the recent ruling that did come down in Saeed V. Bloomberg about the deference that is to be given to that, co-extensively with it- the New York City human rights law. And as the question was certified to the Court of Appeals and did just come down recently, I apologize for the late submission of that. But this court made clear, after a similar finding had been made about the New York City human rights law, that this court handed down Mihalik a certain number of guides that are to be considered when assessing claims under these rights laws. One of which is that it requires the totality of the circumstances. Yep, I think we've got that argument. Okay. Thank you so much, and we'll hear from you on the phone. Thank you. Here you go, Jeff. Good afternoon, Your Honors. Michael Miranda for the District and Principal Paul Sibleys. I do want to ask, your client doesn't seem to be running a very tight ship. There seem to be a lot of occurrences and unprofessionalism that I don't think students should have to undergo. And I hope, at the very least, that this situation has caused people to examine how they are comporting themselves and what level of professionalism they are modeling. Judge Perez, you're absolutely right. I don't want to dwell on Wyandanch and the bigger issues of funding and financing that have been chronicled. But there have been issues there in terms of, and we certainly have cleaned up our act. But in terms of- The students do deserve better, is what I would say. No doubt. It seems like almost all the adults that have been presented to the court in this matter are folks that need to do better for the students. Right. And in that vein, Coach Singleton, who was merely a coach, not an administrator, to your excellent point about Katz-Poe, Your Honor, he's no longer with the District. So I can just say that affirmatively. In terms of what went on here, we have, yes, a federal complaint served at 319 on the District on June 14th. Then we have this gentleman, Mr. Singleton, coming forward to defend himself. And he points to things that Ms. Russo did allegedly on the Puerto Rico trip. Now, that is within hours of the complaint being served on the District, not upon Principal Sibleys. Principal Sibleys, by the way, has a stellar record of helping youth in the community and forming groups to ensure that a lot of the issues that plague Wyandenge don't in the future. I'll just say that to your excellent point. Yeah, I'm unmoved at this point. Yes, I understand. I was hoping that you can focus your argument on how is it that we draft a writing that would not leave a gaping hole in Title VII law by allowing someone to engage in retaliatory harassment of making false claims like that? Well, I think what you have here is the duty to investigate, to protect the students. That's what went on here. Under Title IX, they had a duty to investigate and protect the students. I'm not asking that question. And I'll try and say it again in case it was my fault and I'm being imprecise. How do we both honor that duty without basically writing a playbook for harassers and retaliators to make these kinds of allegations in the future? You can certainly imagine a scenario in which someone would try to harass a complainant by making false allegations. How do they not get a free pass if we say in every circumstance with no qualifications, without any nuance, the duty to investigate will always trump? You start with the fact that these two young men corroborated the allegations. It's in the record. I thought they went through there. No. That's the problem, Judge Sack. They were not interviewed. One, unfortunately, passed away. I'm talking about the contempt. He was murdered, right? Yes. Yes. Yes. It was a very sad situation. That's right. Exactly right. This is exactly what I was talking about, Your Honor. But he corroborated on June 17th why the district went forward with the duty to investigate to the general point of, oh, can't anyone just come here and manipulate the system? To Judge Perez's point, that's not what happened here. At 25-9, there's a corroborated memorandum citing both Shipp and Jordan's statements against Ms. Russo. Ms. Russo, at the time, was a tenured teacher. The district had no issues with her. Why would the district go after a tenured teacher unless they had corroborated statements to HR? Again, back to the piece of paper that is going to come out after this is going to exist and other facts are going to come in and people are going to try to apply it. So as I understand it, what you just said, your suggestion is that the proposition of law is that when there is a complainant corroborating an allegation in connection with the duty, then it is per se not retaliation? It is a legitimate reason to proceed with an investigation. Had we ignored these two young men's statements, precisely what Your Honor was concerned about, about sloppiness in the district, that's what would have happened. Could we have been skeptical? Of course we could have been. That's why we brought in an independent lawyer who had nothing to do with the district and swiftly dealt with the investigation. There's also been some discussion here about what the retaliation is. Ms. Russo, the plaintiff, and her fine counsel both acknowledge there was a duty to investigate. What I'm saying is there's not only a duty to investigate, but then once you have corroboration, you have to act. Because if you don't, that is virtually grossly negligent. It is entirely improper for the school district, as guardians and stewards of our youth, then to say on a school-sanctioned trip, we're just going to put our head in the sand because it was two years ago. And here's the other fact that shouldn't be ignored. Principal Sibleys and Ms. Russo, I think it's undisputed, were good friends. They were on the Puerto Rico trip together. If this had been true, Sibleys would have been implicated also for allowing this to go on during his watch. Sibleys had no motive here. Singleton, you're precisely right. Singleton had the motive. They didn't sue Singleton. Why didn't they sue Singleton? Because of decisions like Augusto from this circuit, where a principal is not a decision maker. And if a principal is not a decision maker, how is an assistant football coach a decision maker? Right, but again, that's where the cat's paw comes in, is that he manipulated. There's an argument to be said that I bet he manipulated Hodge to save his own neck. But that has not been alleged below. And that's not the theory. Can you tell me why you believe that you still prevail if we decide that the district court erred in not permitting the two affidavits to come in? Oh, you mean the three affidavits? Well, I'm focused on budget and- Well, no, no, there's three affidavits. That's precisely the point. These were so unreliable that Judge Brown was entirely right. We haven't spoken about the fact that Ms. LeGette submitted an affidavit in 2021. Then, suddenly, after we move to summary judgment in April of 2002, I'm confronted by a new affidavit at 2615 of the record. It's only then, in the subsequent record, Your Honors, that she says this business about Singleton calling me and says she needed, they needed my son. My question would be if we disagree with you and think that the district court erred in not letting it in, do you still prevail, and why? Absolutely. How does it materially sway the fact finder's judgment here? How does it show anything about the district's motivation? What did the district do here? This has to do with a third party to the action here, Singleton. Singleton's not even mentioned in the federal sexual harassment complaint. It's not as if he was a conspirator there. Ms. Russo made separate, non-touching complaints about oral remarks that Singleton made in June of 2021. He has nothing to do with the federal complaint at issue. And the other reason it's harmless error is because they complement. They complement Principal Sibley's. If you go to Leggett, it says my son was part of Defendant Sibley's mentorship program at Wyandanch High School, period. Defendant Sibley's was a mentor to my son. There's nothing negative about Sibley's, who's a defendant. There's nothing negative about the district. So as far as I'm concerned, assume, assume that it should have been let in, Your Honors. There's nothing here that implicates anyone. It wouldn't have swayed Judge Brown, and I submit it shouldn't sway you. There's no issue of fact here. The district, everyone agrees. My adversaries, Ms. Russo under oath, the district had to investigate this. I give you another fact now in the record, undisputed, that the two young men stood face to face with the head of HR, Kester Hodge, and corroborated the drinking and the sexual allegations. By the way, with all due respect to my adversary, there was never an allegation of drugs. There was never an allegation of molestation. That was it, okay? And on top of that, these affidavits are rampant hearsay. These are mothers who are hearing from their underage sons. Your briefs are pretty detailed on that. Okay. Are we done? Okay. Okay, thank you so much. Thank you. Appreciate it. You've got your two minutes. Your Honor, to answer the same question you just gave to my opposing counsel, that even if these affidavits are not allowed in, I think that Ms. Russo is able to show but for causation, which is the standard under Title VII for retaliation. As well, she is able to show a mixed motive, that it was a motivating factor for the district to cause this action to her. That under the New York City Human Rights Law, and I think it's been an open question under the New York State Human Rights Law, whether or not a mixed motive analysis is allowed. I'm sorry. This is too simple a question, but you're talking about mixed motives. Mixed motives do what? Put it in context for me. Whether or not the alleged retaliatory act because of her was caused by her protected complaint, whether or not that was a possible motivation for it, or in addition to whatever it was that Singleton might have said or alleged. In Albunio, it is clear that it states that if there is a reason to believe that the employer is aware of a complaint being made, and then the complainant suffers adverse actions or improper, that that is enough to show the causal link between the two. And that is the standard as articulated with respect to the New York City Human Rights Law, which I'm arguing that the New York State Human Rights Law should be interpreted coextensively with it. With respect to the previous question, what is the district to do in this circumstance? And I think that while an investigation is warranted, I think that we do not know exactly what that investigation needs to look like. Further, I think there does need to be some. Are we supposed to figure out what it's supposed to look like? I think it is up for the. We have not, as I said before, we haven't had any testimony from the district. We don't know what the district's policies are. So I think it's until we know exactly what the district says this is supposed to look like, we can't answer that question. And further, I think it's, you know, as this court wrote in what Josephine Levitt about an investigation, whether or not that can rise to the level of an adverse employment action when assessing a gender discrimination, it says without something more. And this court provides the example that a particularly dilatory investigation could rise to the level of an adverse employment action. And I would argue that by extension, perhaps an investigation, particularly dilatorily, you know, predicated that suddenly, yes, that someone two years previously, we are told throughout that temporal proximity can be enough to draw an inference. And generally, when we're talking about temporal proximity to the complaint, it's there are new allegations that this person did something, that this person complained, and then all of a sudden they are being papered for showing up late to work. It doesn't anticipate that this is suddenly accused of something that happened two years prior. This person has had in their pocket for some time. How long has he known about this? Where did this information come from? None of that is ever put into the record. Where does, as for whether or not the connection, why could this not be that this was Singleton's retaliation, I would say that there wasn't enough time is essentially the issue. He only became aware of the allegations about himself on the 15th, which was the same time that he was asked, that he came forward with, oh, yeah, well, in my defense, let me tell you about this awful thing that I've heard about Ms. Russo. Okay. Thank you so much. I do appreciate you all accommodating the afternoon sitting, and we will take this case under investment.